**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JACQUE GONZALEZ, | No. CIV S-07-2567-CMK |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |
| _____/ | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Doc. 19) and defendant's cross-motion for summary judgment (Doc. 20).

/ / /

/ / /

/ / /

/ / /

1

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on February 3, 2005.  In the application, plaintiff claims that disability began on May 15, 2003.  In a disability report submitted with her application, plaintiff claims that disability is caused by tendinitis in both hands, elbows, and arms.  In a second disability report submitted on June 13, 2005, plaintiff asserts that, as of March 2005, she has problems with her back and "gets grouchy sometimes."  In her motion for summary judgment, plaintiff lists the following impairments:  "fibromyalgia, spondylosis of the lumbar and cervical spine, bilateral carpal tunnel syndrome, GERD, right knee meniscal impairment, right elbow tendinitis, and irritable bowel syndrome."

Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on November 7, 2006, before Administrative Law Judge ("ALJ") Theodore T.N. Slocum.   In a February 22, 2007, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1.      The claimant has not engaged in substantial gainful activity since May 15, 2003, the alleged onset date;

2.      The claimant has the severe impairments of bilateral upper extremity tendinitis with possible carpal tunnel syndrome, mild right lateral epicondylitis, and right hip tenderness;

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments;

4.      The claimant has the residual functional capacity to perform light work that would require her to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 6 hours in an 8 hour workday, occasionally push/pull; occasionally crawl and climb ladders, ropes, and scaffolds and frequently climb ramps and stairs, crawl and crouch, and perform occasional gross handling;

5.      The claimant is able to perform her past relevant work as a general clerk and cashier; and

6.      In the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on October 2, 2007, this appeal followed.

## II. SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following medical records, summarized chronologically below.

March 21, 2001 – The CAR contains a report by Donald Wade, M.D., of an MRI of plaintiff's cervical spine.  The doctor indicated that the overall structure of the cervical spine was unremarkable.  He did, however, note a "mildly enlarged" thyroid, as to which he recommended ultrasound correlation.  Dr. Wade concluded that the study was "essentially negative."  See Exhibit 18F; CAR 252-53.

July 10, 2002 – A phone note contained in plaintiff's records from Kaiser Permanente[1] indicates that she had complained of joint pain in her "right shoulder to hand" and bursitis in her hip.  See Exhibit 12F; CAR 231.

August 26, 2002 – R.C. Nathan, M.D., performed a pelvic/abdominal CT scan which showed:

> Diffuse wall thickening of the descending colon and sigmoid colon. Differential diagnosis includes ischemic bowel, lymphoma, inflammatory bowel disease such as Crohn's disease and ulcerative colitis status post radiation. . . .

August 27, 2002 – Another phone note contained in plaintiff's Kaiser records indicates that a CT scan was performed the day before which revealed "a hardening in her colon." Plaintiff was "referred to GI."  See Ex. 12F; CAR 223.

December 11, 2003 – Dr. Mohinder Nijjar, M.D., reported on his November 10, 2003, examination of plaintiff in the context of a workers' compensation claim.  Dr. Nijjar recited the following history:

> [Plaintiff] was working for Pick 'n Pull, an auto dismantler, beginning in 7/01 as a processor and front desk person.  Her job was basically working on the computer and doing paperwork, using her hands on a repetitive basis.  Over a period of time, she began experiencing pain in both wrists,

---

[1]     These records are almost entirely illegible.

and on 4/4/03, her right wrist became very painful and she reported the injury.

She was sent to U.S. Healthworks, evaluated and given medications and a splint for her right wrist.  She then began to use her left hand much more, and the same symptoms began in the left wrist on 4/10/03.[2]  She was diagnosed with tendinitis, put on modified work and given a brace for the left wrist as well.  She continued to work on a modified basis as of 5/03, when she was taken off work completely and has not worked since.

She had treatment for her wrists and was sent to Dr. Goldberg for evaluation, who thought her injuries were not work-related.  He felt it was from an auto accident in 2001 which affected her neck as she had complained she had tingling in the hands at that time.  Therefore, he felt it was an aggravation of a pre-existing condition.

However, there is no evidence or history that the patient ever had any follow-up treatment once electrical studies were done on her upper extremities, which were normal studies.  She also has had no problems with her hand since that time.

Dr. Nijjar stated that plaintiff's current complaints were of:  (1) constant "slight pain" in both wrists and the right elbow "to some extent," becoming moderate when she cooks, washes dishes, cleans, or drives; (2) occasional swelling of both hands, increasing towards the end of the day; and (3) weakness in both upper extremities.

On physical examination, Dr. Nijjar reported the following as to plaintiff's upper extremities:

1.      Full range of motion of shoulders with no impingement signs;

2.      No tenderness in the upper arms;

3.      Slight tenderness in the elbows with negative Tinel's sign;

4.      Range of motion in flexion, extension, pronation, and supination within normal limits;

5.      Sensation in upper extremities within normal limits; and

6.      Power in muscle groups within normal limits.

---

[2]      Dr. Nijjar notes that plaintiff is left handed.

4

As to plaintiff's wrists and hands, Dr. Nijjar reported:

1.      Tenderness in right flexor tendon;

2.      Positive Tinel's sign for median neuritis but negative Tinel's sign for ulnar neuritis;

3.      Negative Finkelstein test on the right;

4.      Right wrist dorsiflexion, palmar flexion, radial deviation, and ulnar deviation within normal limits;

5.      Crepitus in the common flexor tendons on the left at the level of the carpal tunnel;

6.      Positive Tinel's sign on the left for median neuritis;

7.      No thickening of the A1 pulleys on the left;

8.      Range of motion on the left within normal limits;

9.      Jamar testing results were 50-47-46 on the right and 45-43-41 on the left.

Dr. Nijjar diagnosed bilateral tendinitis and mild lateral epicondylitis on the right.  He recommended electrodiagnostic studies and steroid injections at the common flexors of both wrists to relieve pain.  He concluded that plaintiff was partially temporarily disabled, but not yet permanent and stationary.  See Ex. 7F; CAR 184-94.

        March 30, 2004 – Dr. Michael Bronshvag, M.D., reported on electrodiagnostic studies conducted on March 9, 2004.   He found that motor conduction velocities and "F"-latencies were normal; distal motor latencies were bilaterally normal; and sensory data was normal.  Overall, he concluded that the "conduction study is entirely normal." See Exhibit 8F; CAR 196-97.

        June 21, 2004 – Dr. Nijjar submitted a letter containing his assessment in light of Dr. Bronshvag's report of plaintiff's normal electrodiagnostic studies.  He stated that the "possibility of the patient having carpal tunnel syndrome decreases" but that symptoms of carpal tunnel syndrome persist and plaintiff "does have signs of tendinitis."  Dr. Nijjar concluded that, despite no signs of "delay in conductions" plaintiff still required treatment for tendinitis.  See

Exhibit 9F; CAR 199-200.

March 17, 2005 – Plaintiff submitted responses on a form entitled "Exertional Daily Activities Questionnaire Since Your Disability Began."  When asked to describe with specificity how her symptoms prevent her from working, plaintiff stated:

> I have pain in my hand all the way up to my shoulders.  Now it has gotten worse since the last time I saw a Dr. for it.  I have burning sensations in my upper arms, tingling in my hand.  My hands give out on me and my wrists feel like I sprained them at times.

She stated that "[w]alking does not effect my disability" when asked to explain how she feels after walking for any particular distance.  She also stated that she does not do any grocery shopping, yard work, or house cleaning.  She stated, however, that when she does do any of these things, she has to stop "after only 5 minutes . . . because the pain is too bad."  She stated that she can drive for ten miles at the most "before my hands start hurting and my elbows hurt also."  See Exhibit 12E; CAR 153-55.

May 11, 2005 – Agency examining doctor Rajeswari Kumar, M.D., submitted a report following a complete orthopedic evaluation of plaintiff.  Dr. Kumar recited the following history:

> The claimant reports that in 1991 she had a slip and fall and injured her hip. The claimant was diagnosed as having bursitis and was given anti-inflammatory medication.  She denies having any fracture.  She had a motor vehicle accident in 2001 and injured her lower back, and she received chiropractic treatment and she continues to attend chiropractic treatment once or twice a month.  She reports constant low back pain with intermittent radiation to the right lower extremity.  She did not report any numbness in the lower extremities.
>
> She had a work related injury on 02/07/2003.[3]  She reports that her job included computer work and also she had to use heavy paper clips repeatedly.  Her pain was initially in the right hand and then she started experiencing pain in the left hand.  Eventually, the claimant started experiencing pain in both upper extremities.  She was then seen by the doctor and she had x-rays and several EMG/nerve conduction studies.  She was given physical therapy, medication, and bilateral hand splints.  She

---

[3]   According to Dr. Nijjar, plaintiff reported her work injury in April 2003.

> reports that her symptoms improved a little.  She continues to have constant bilateral upper extremity pain with occasional numbness in both hands.
> The pain is sharp and throbbing and aggravated with lifting.  She takes anti-inflammatory medications for pain relief.

With respect to medications, plaintiff told Dr. Kumar that she was taking Aleve, Protonix, Premarin, multi-vitamins, and calcium supplements.  She stated that she last worked on May 15, 2003.

On physical examination, Dr. Kumar did not note any abnormalities with plaintiff's cervical or lumbar spine.  As to her extremities, Dr. Kumar reported:  (1) normal shoulder range of motion with no tenderness and normal muscle strength; (2) normal elbow range of motion with no tenderness or reported pain; (3) normal wrist range of motion with negative Tinel sign, negative Adson test, and no joint effusion; (4) normal finger range of motion with no tenderness; (5) normal hip range of motion with negative Fabere test, but tenderness over the right trochanteric bursa; (6) normal knee range of motion with negative McMurray test, Lachman test, and Drawer test, no tenderness, and no joint effusion; and (7) normal ankle range of motion.  Dr. Kumar also reported normal motor strength and sensation.  As to functional limitations, Dr. Kumar stated:

> Functional limitation is due to the tenderness of the trochanteric bursa.  The claimant can stand and walk six hours per day without assistive device.
> There is no objective finding to suggest any limitation for upper extremity activities.  There is no limitation with lifting, carrying, sitting, kneeling, and climbing activities.

See Exhibit 10F; CAR 202-06.

May 19, 2005 – Agency consultative doctor Patrick Bianchi, M.D., submitted a "Consultation Request" form in which he opined, based on a review of plaintiff's records and complaints of "tendinitis in both hands, elbows & arms," that plaintiff's impairments are not severe.  See Ex. 5F; CAR 174-75.

///

///

1              June 16, 2005 – Charles McCrory, M.D., of Roseville Advanced Medical Group

2      provided a "Medical Assessment of Ability to do Work-Related Activities (Physical)."[4]  Dr.

3      McCrory opined that plaintiff could occasionally lift ten pounds, stand/walk for one hour at a time

4      for a total of four hours, and engage in sedentary activities for one hour at a time for up to eight

5      hours.  Plaintiff was limited in her ability to lift due to decreased left hand grip strength,

6      hypesthesia in the upper extremities, and positive Tinel's sign at the elbows and wrists.  Dr.

7      McCrory opined that plaintiff was limited in her ability to do even sedentary work due to sensory

8      and strength loss in the upper extremities "as well as fibromyalgia."  The doctor found that

9      plaintiff was restricted with respect to reaching, handling, and feeling due to "increased pain,

10     decreased endurance."

11             June 21/25, 2005 –  Dr. McCrory reported on x-rays taken on June 21 and 25,

12     2005.  The doctor stated that there was no significant difference between the two sets of x-rays,

13     which both showed some abnormalities.  See Exhibit 16F; CAR 249.

14             June 29, 2005 – In treatment notes Dr. McCrory reported that plaintiff's subjective

15     complaints were "ongoing chronic upper and lower spinal pain with diffuse muscle soreness

16     consistent with fibromyalgia."  Plaintiff requested trigger point injections to decrease spasms

17     which she reported to be debilitating.  On physical examination, Dr. McCrory reported

18     "cervicothoracic spasm noted today with tenderness to palpation."  Trigger point injections were

19     administered with plaintiff to follow up in one week.  See Exhibit 13F; CAR 239.

20             July 13, 2005 – An agency consultative doctor submitted a "Consultation Request"

21     form in which it was opined that plaintiff did not have any severe impairments.  The doctor noted

22     that plaintiff takes Tylenol and Aleve for pain relief.  The doctor also noted a June 2005

23     evaluation for complaints of back pain.  The doctor specifically noted fibromyalgia based on

24     "14/18" tender points.  The doctor reported that plaintiff's grip was intact, she was able to heel/toe

25     _____

26             [4]        Plaintiff provides this date, which is the date of Dr. McCrory's initial evaluation
       of plaintiff.

1  walk, her strength was "5/5," and joint range of motion was normal. Finally, the doctor stated:

2  "She states she gets grouchy when she does not sleep, but don't we all." See Exhibit 11F; CAR

3  209-210.

4         July 14, 2005 – Consultative agency doctor Sandra Clancey, M.D., submitted a

5  physical residual functional capacity assessment form in which she opined that plaintiff could

6  do the following: (1) lift/carry up to ten pounds frequently and up to 20 pounds occasionally;

7  (2) sit/stand/walk for up to six hours in an eight-hour day; and (3) push/pull with no limitations.

8  Dr. Clancey did not find any postural limitations except a limitation to only occasional climbing

9  of ropes and ladders. The doctor found that plaintiff was limited in gross manipulation (handling)

10 ability. No visual, communicative, or environmental limitations were found. See Ex. 6F; CAR

11 176-83.

12        July 19, 2005 – Dr. McCrory reported on additional x-rays taken in his office. He

13 noted pelvic obliquity, left posterior body rotational malpositions, normal lumbar lordosis,

14 extension of the L5 vertebra onto the sacrum with secondary L5-S1 facet imbrication, and

15 minimal disc thinning and osteophytosis. See Exhibit 16F; CAR 250.

16        October 25, 2005 – Dr. McCrory prepared a report based on his examination and

17 treatment of plaintiff. According to Dr. McCrory, plaintiff first saw him in June 2005 with

18 complaints of "chronic upper and lower spinal pain, greater at the lumbosacral level, with

19 associated tingling and numbness into the right lower extremity." Plaintiff also complained that

20 "her hands swell at times and she has weak grip strength in both upper extremities, as well as

21 upper extremity pain." Plaintiff also "described elbow stiffness." Plaintiff reported to Dr.

22 McCrory that her pain was debilitating. The doctor states that the back problems are secondary to

23 the 2001 car accident and that "[a]ccording to the patient, MRI scan of the cervical and lumbar

24 spinal levels revealed degenerative disc disease at that time."[5] The doctor also states that plaintiff

25

26        [5]    Contrary to plaintiff's report to Dr. McCrory, Dr. Wade concluded that the March 2001 MRI study was "essentially negative."

told him about an "on-the-job right carpal tunnel syndrome injury which ultimately involved bilateral wrist pain." Finally, plaintiff reported a "history of . . . recurrent gastritis." Dr. McCrory indicated that plaintiff's medications at the time of his report consisted of Premarin  and "Pepcid medication." He did not note any pain relief medication.

   Dr. McCrory noted the following objective findings on physical examination:

   1.   Some flattening of the normal cervical lordosis;

   2.   Low right hip in relation to the left;

   3.   Global ranges of cervical, thoracic, and lumbar spinal motion is full and symmetrical, but with increased pain during all phases of cervical and lumbosacral global motion;

   4.   Joint fixation revealed on palpation of the spine, with mild spasm and 14 out of 18 positive trigger point areas;

   5.   Positive Adams test suggestive of mild scoliosis;

   6.   Negative DeKleyne's test;

   7.   Positive Deerfield maneuver suggestive of pelvic obliquity;

   8.   Positive Ely's maneuver;

   9.   Positive Patrick's maneuver;

   10.   Normal bilateral shoulder motion in all phases;

   11.   Normal elbow motion, but positive Tinel's sign bilaterally for ulnar nerve sensitivity to palpation;

   12.   No edema in wrists and normal wrist range of motion bilaterally, but positive Tinel's sign bilaterally indicative of carpal tunnel syndrome; and

   13.   Decreased grip strength in the left hand.

Dr. McCrory diagnosed:  (1) chronic cervicothoracic strain; (2) fibromyalgia; (3) mechanical cephalalgia; (4) carpal tunnel syndrome; (5) hypesthesia weakness in the upper extremities; and (6) hypesthesia in the right lower extremity.  He offered the following functional assessment:

   Currently, this patient is not employable at the present time because of decreased left hand grip strength, hypesthesia into the upper extremities, evidence of carpal tunnel syndrome, signs of cubital tunnel syndrome

bilaterally, as well as diffuse muscle tenderness to palpation. She cannot lift greater than 10 lbs. occasionally and her ability to bend, climb, balance, stoop, crouch, kneel, and crawl are significantly compromised. Her ability to handle and feel objects, as well as her ability to push and pull are also compromised by her current chronic conditions. Vibration sense is also compromised.

Dr. McCrory opined that plaintiff was permanent and stationary. See Exhibit 15F; CAR 246-48.

July 27, 2006 – Treatment notes from Dr. McCrory reveal that plaintiff reported "significantly decreased diffuse spinal pain with Cymbalta." On physical examination, he noted normal left shoulder range of motion but significant tenderness to palpation. He diagnosed: chronic mechanical back strain, myofascial pain syndrome; fibromyalgia; and irritable bowel syndrome. See Exhibit 20F; CAR 262.

September 18, 2006 – Dr. McCrory's treatment notes of this date indicate that plaintiff continued to complain of spinal pain. Objectively, he noted that plaintiff continued to guard the left upper back and neck and experience "significant pain on palpation diffusely throughout the spine. . . ." He diagnosed: chronic mechanical back strain, myofascial pain syndrome; fibromyalgia; and irritable bowel syndrome. See Exhibit 20F; CAR 261.

October 17, 2006 – Larry R. Feliciano, M.D., completed a form entitled "Medical Assessment of Ability to do Work-Related Activities (Physical)." Based on his physical examination, Dr. Feliciano diagnosed fibromyalgia and GERD. The doctor opined that plaintiff could lift five pounds occasionally and two-and-a-half pounds frequently. He also stated that plaintiff could only stand/walk for one-half hour without interruption for a total of two hours a day. Dr. Feliciano stated that plaintiff could only sit for one-half hour for up to four hours a day. According to the doctor, plaintiff could occasionally bend and stoop, never climb, crouch, kneel, or crawl, and frequently balance. He found that plaintiff was impaired with respect to reaching, pushing, and pulling. He also found numerous environmental restrictions. Dr. Feliciano stated that the assessed limitations were due to chronic diffuse pain. See Exhibit 19F; CAR 254-55.

///

November 7, 2006 – Plaintiff appeared at the administrative hearing and offered testimony concerning her symptoms and limitations, which plaintiff summarizes as follows:

> Claimant, Jacque Gonzalez and vocational expert (VE), George Grams, testified at her hearing before Administrative Law Judge Theodore Slocum on November 7, 2006, in Sacramento, California. . . . Ms. Gonzalez was represented by attorney Gail Stassinos.
> Ms. Gonzalez testified that she was 43 years old and had a high school diploma. She stated that she had last worked May 15, 2003, in the office at an auto dismantling yard and left that job due to "tremendous pain." TR 295-296.
> Ms. Gonzalez testified that Drs. Feliciano and McCrory were her treating physicians. TR 297-298. She explained that she was diagnosed with fibromyalgia by Dr. McCrory. With respect to a typical day, Ms. Gonzalez testified that it took her an hour and a half to get ready in the morning because she had to "stop in between." TR 301. She stated that she typically did not eat breakfast and really didn't do "a whole lot of anything because I hurt, and I tire real easy, and by the end of the day I'm just ready to just collapse." TR 301.
> With respect to writing, filing, and typing, Ms. Gonzalez testified that "my hands cramp on me sometimes. I can't write all the time. They swell. They ache. It's hard to move around sometimes." TR 303. She testified that she could not hold her head in a downward position for a long time when typing because it started to ache. TR 303.
> The ALJ and Ms. Stassinos then discussed some of the medical evidence. Ms. Stassinos finally stated for the record that there was "objective evidence in support of Dr. McCrory's assessment, Dr. Feliciano's assessment and the claimant's contentions regarding her functional disability." TR 307. Ms. Stassinos also pointed out to the ALJ that Dr. McCrory's chart notes had multiple exam findings. TR 308.

## III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

1  v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

2  decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen,

3  879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or

4  if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is

5  conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where

6  the evidence is susceptible to more than one rational interpretation, one of which supports the

7  Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947,

8  954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in

9  weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

10

11                                    **IV.  DISCUSSION**

12              In her motion for summary judgment, plaintiff argues:  (1) the ALJ improperly

13  failed to credit the opinions of her treating physicians, Drs. McCrory and Feliciano; (2) the ALJ

14  improperly rejected her testimony as not credible; and (3) the ALJ improperly relied on the

15  vocational expert's answers to hypothetical questions which did not reflect all her limitations.

16         **A.      Treating Physicians' Opinions**

17              The weight given to medical opinions depends in part on whether they are

18  proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

19  821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

20  professional, who has a greater opportunity to know and observe the patient as an individual, than

21  the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th

22  Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the

23  opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th

24  Cir. 1990).

25  / / /

26  / / /

1          In addition to considering its source, to evaluate whether the Commissioner

2   properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in

3   the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

4   uncontradicted opinion of a treating or examining medical professional only for "clear and

5   convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

6   While a treating professional's opinion generally is accorded superior weight, if it is contradicted

7   by an examining professional's opinion which is supported by different independent clinical

8   findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

9   1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

10  rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

11  81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

12  the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

13  finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

14  legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

15  professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

16  without other evidence, is insufficient to reject the opinion of a treating or examining

17  professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

18  conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

19  1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see

20  also Magallanes, 881 F.2d at 751.

21          The ALJ first discussed the findings and opinions of Drs. Nijjar, Kumar, and

22  Clancey.  In particular, he gave Dr. Kumar's opinion weight "so far as it shows that the claimant's

23  objective physical examinations demonstrate nothing by way of objective deficits."  The ALJ gave

24  Dr. Clancey's opinion "considerable weight" and incorporated her assessed limitations into the

25  ultimate residual functional capacity finding.  Other than arguing that, as to Dr. Clancey, the ALJ

26  accepted a non-treating doctor's opinion over that of a treating doctor, plaintiff does not

14

specifically challenge the ALJ's analysis of Drs. Nijjar, Kumar, and Clancey.

Plaintiff's argument focuses on Drs. McCrory and Feliciano, whose opinions the ALJ gave no weight. As to Drs. McCrory and Feliciano, the ALJ stated:

> Charles McCrory, M.D., has treated the claimant since 2005. Although he opines that the claimant has "chronic mechanical back strain; myofascial pain syndrome; fibromyalgia; irritable bowel syndrome" . . . diagnostic studies have shown the claimant's cervical and lumbar spine to be normal. Dr. McCrory finds the claimant to have diminished sensory functions in the C5-8, T1 and L5-S1 distributions. The claimant has denied numbness. Additionally, she has no cervical or lumbar spine stenosis or other impairment and objective medical examiners have found that she has normal neurological functions. Therefore, the Administrative Law Judge does not find Dr. McCrory's opinion of diminished sensation credible.
>
> Larry R. Feliciano, M.D., completed an assessment that is undated (Exhibit 14F).[6] In this undated assessment, Dr. Feliciano opines that the claimant is unable to perform sedentary work due to decreased left hand grip and hypesthesia of the upper extremities. Jamar Hand Dynomoter testing showed that the claimant had adequate grip strength of 45/43/41 in her dominant left hand and objective examination by the qualified medical examiner and consultative examiner show that the claimant has normal sensory functions of her upper, as well as lower, extremities.
>
> In an assessment dated October 17, 2006, Dr. McCrory opined that the claimant is incapable of even sedentary work due to "diminished muscle effort due to pain" and "poor effort tolerance" (Exhibit 19F/1).[7] However, the claimant's other examinations showed no evidence of "diminished muscle effort due to pain" or "poor effort tolerance" as the claimant demonstrated 5/5 motor power, a normal gait and the ability to walk on heels and toes. He states that "pain and stiffness" would prevent the claimant from performing sedentary work (Exhibit 19F/2). However, the claimant has never exhibited stiffness of any joint upon examination. Dr. McCrory also stated that the claimant has "chronic arthritis pain," but has never been diagnosed with arthritis. In fact, her radiographic studies have ruled it out. Dr. McCrory's opinion in this assessment is not supported by, but is contradicted by, the objective medical evidence of record of negative radiographic and clinical studies. . . .
>
> On October 26, 2005, Dr. McCrory wrote a letter stating that the claimant was not currently able to work (Exhibit 15F). The reasons stated were: "decreased left hand grip strength, hypesthesia into the upper extremities, evidence of carpal tunnel syndrome, signs of cubital tunnel syndrome

---

[6]   Exhibit 14F is an undated assessment provided by Dr. McCrory. According to plaintiff, the assessment was completed on June 16, 2005.

[7]   Exhibit 19F is actually an assessment provided by Dr. Feliciano.

bilaterally, as well as diffuse muscle tenderness to palpation." (Exhibit 15F/3). Testing with a Jamar Hand Dynamometer showed that the claimant had adequate grip strength, objective examinations by the qualified medical examiner and consultative examiner shows that the claimant has normal sensory function of her upper, as well as lower, extremities, the claimant has not been diagnosed with cubital tunnel syndrome based upon any acceptable medical technique; and, when examined by Dr. Kumar, had no diffuse tenderness to palpation. For the same reasons noted in the above paragraph, the undersigned also gives this opinion no weight.

As noted, the ALJ appears to have attributed Exhibits 14F and 19F to the wrong doctors. Contrary to the ALJ's descriptions, Exhibit 14F contains Dr. McCrory's opinion and Exhibit 19F contains Dr. Feliciano's opinion. With this in mind, the court will discuss the ALJ's findings for each doctor in turn below.

        1.   <u>Dr. McCrory</u>

      The ALJ gave the following reasons for rejecting Dr. McCrory's opinion: (1) the finding of decreased left hand grip strength is at odds with Jamar testing results which indicate "adequate grip strength"; (2) the finding of reduced sensation (i.e., hypesthesia) is not consistent with other findings of normal sensory functions of her upper, as well as lower, extremities; (3) the finding of diffuse tenderness to palpation (i.e., fibromyalgia) is not consistent with Dr. Kumar's findings; and (4) there are no findings consistent with cubital tunnel syndrome. Plaintiff argues generally that, contrary to the ALJ's assertion, the doctor's conclusions are supported by his own objective findings on physical examination. She also argues more specifically that, as to the ALJ's conclusion that plaintiff has "adequate grip strength" on the left, no doctor has ever made such a finding and there is no evidence to support it.

      <u>Decreased Grip Strength</u> – Turning first to plaintiff's argument concerning grip strength, the court agrees with plaintiff that no doctor has used the word "adequate" to describe plaintiff's grip strength. The Jamar test results to which the ALJ appears to refer are those observed by Dr. Nijjar when he examined plaintiff in December 2003. In particular, Dr. Nijjar noted that plaintiff's grip strength was 50-47-46 on the right and 45-43-41 on the left. Thus, plaintiff's left-hand grip strength was observed to be weaker than on the right, which is not what

1  would be expected from a person who is left-hand dominant.  Given that Jamar test results were

2  lower on the left and that plaintiff is left handed, it is clear that she had decreased left-hand grip

3  strength in December 2003.  Dr. McCrory also noted decreased grip strength in the left hand when

4  he examined plaintiff in October 2005.  While it is true that Dr. Bronshvag noted normal

5  electrodiagnostic study results in March 2004, and Dr. Kumar noted normal hand and wrist

6  function in May 2005, no doctor has described plaintiff's left hand grip strength as "adequate."

7           Nonetheless, the ALJ included a limitation to only occasional gross manipulation

8  in his residual functional capacity assessment.  This is consistent with the findings of agency

9  consultative doctor Clancey, who opined in July 2005 that plaintiff was limited in gross

10  manipulation ability.  In fact, the ALJ's assessment of a limitation with respect to gross

11  manipulation appears to give plaintiff the benefit of the doubt.  Specifically, Dr. Nijjar noted in

12  December 2003 that power in muscle groups within normal limits.  Agency examining doctor

13  Kumar noted in May 2005 normal wrist range of motion with negative Tinel sign, negative Adson

14  test, and no joint effusion; normal finger range of motion with no tenderness; normal motor

15  strength.  Agency consultative doctor Bianchi opined in May 2005 that plaintiff's impairments are

16  not severe.  And, another agency consultative doctor noted in July 2005 that  plaintiff's grip was

17  intact, her strength was "5/5," and joint range of motion was normal.

18           Only Dr. McCrory opined – based on a single evaluation – that plaintiff's

19  decreased grip strength rendered her disabled.  His opinion in this regard is simply inconsistent

20  with the weight of the evidence of record.  As such, and despite the ALJ's imprecise use of the

21  word "adequate," the record supports the ALJ's ultimate conclusion that Dr. McCrory's opinion

22  regarding limitations resulting from plaintiff's decreased grip strength in the left hand was not

23  entitled to any weight.

24  ///

25  ///

26  ///

1          Cubital Tunnel Syndrome – Turning next to Dr. McCrory's opinion that plaintiff

2   "is not employable . . . because of . . . signs of cubital tunnel syndrome bilaterally," the court finds

3   that the ALJ was correct in stating that plaintiff has never been diagnosed with this impairment.

4   Even Dr. McCrory only found that plaintiff exhibited "signs" of cubital tunnel syndrome, stopping

5   short of actually diagnosing the condition.

6          Hypesthesia – Dr. McCrory also concluded that plaintiff was disabled due to

7   decreased sensation, an opinion which the ALJ rejected as inconsistent with the other evidence of

8   record.  As with Dr. McCrory's opinion regarding grip strength, his opinion that plaintiff is

9   limited due to decreased sensation is also inconsistent with the record as a whole.  Specifically,

10  Dr. Nijjar reported that sensation in plaintiff's upper extremities within normal limits; Dr.

11  Bronshvag noted that sensory data was normal; and Dr. Kumar found normal sensation.  Again,

12  only Dr. McCrory opined that plaintiff's sensation was decreased and that this problem limited her

13  ability to do work-related activities.

14         Fibromyalgia – Dr. McCrory opined that plaintiff could not do any work activity

15  due to "diffuse muscle tenderness to palpation," apparently referring to his diagnosis of

16  fibromyalgia.  Plaintiff argues:  "Because the ALJ rejected the opinions of [Dr. McCrory] and

17  discounted her diagnosis of fibromyalgia, he failed to appreciate that this impairment was an

18  essential basis for her assessed limitations."  Thus, the first question is whether the ALJ erred by

19  excluding fibromyalgia as a medically determinable severe impairment.  If fibromyalgia is a

20  severe impairment, the next question is whether the condition limits plaintiff's ability to work.

21         In order to be entitled to benefits, the plaintiff must have an impairment severe

22  enough to significantly limit the physical or mental ability to do basic work activities.  See 20

23  C.F.R. §§ 404.1520(c), 416.920(c).   In determining whether a claimant's alleged impairment is

24  sufficiently severe to limit the ability to work, the Commissioner must consider the combined

25  effect of all impairments on the ability to function, without regard to whether each impairment

26  alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996);

see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  See Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone is insufficient.  See id.

While plaintiff is correct that the cause of fibromyalgia pain eludes objective measurement, See Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004) (citing Green-Younger v. Barnhart, 335 F.3d 99, 108 (2nd Cir. 2003)), the existence of fibromyalgia pain can be determined objectively.  Initially, one would expect someone with fibromyalgia to complain of chronic pain.  The record, however, is rather scant with respect to complaints of the kind of chronic whole-body pain typically associated with fibromyalgia.  Kaiser phone notes from July 2002 indicate that plaintiff complained of joint pain in her "right shoulder to hand" and bursitis in her hip.  There is no record, however, of any specific follow up care by Kaiser doctors for diffuse pain.  Almost eighteen months later in December 2003, plaintiff reported to Dr. Nijjar current complaints of constant "slight pain" in both wrists and the right elbow "to some extent," becoming moderate when she cooks, washes dishes, cleans, or drives, and occasional swelling of both hands, increasing towards the end of the day.  On physical examination, Dr. Nijjar noted no tenderness in the upper arms, only slight tenderness in the elbows with negative Tinel's sign, and tenderness in right wrist flexor tendon.  "Slight pain" which sometimes becomes moderate is certainly not the kind of chronic pain associated with fibromyalgia.  Another eighteen months later in May 2005, Dr. Kumar noted that plaintiff complained of constant low back pain with intermittent radiation to the right lower extremity, and constant bilateral upper extremity pain with occasional numbness in both hands.  On physical examination, Dr. Kumar observed  tenderness

over the right trochanteric bursa, but not in any other area.  Based on the foregoing, it does not appear that plaintiff ever really even complained of fibromyalgia-related chronic pain.

Fibromyalgia is mentioned for the first time by Dr. McCrory in his June 16, 2005, assessment.  In October 2005, Dr. McCrory reported 14 out of 18 positive trigger points.  However, other than taking Aleve, Tylenol, and Cymbalta, the record does not reflect that plaintiff ever sought any more aggressive treatment for her pain symptoms, except one-time trigger point injections by Dr. McCrory in June 2005.  There is no evidence that plaintiff was ever evaluated by a rheumatologist or other specialist familiar with diagnosing fibromyalgia.[8]  Nor is there evidence that plaintiff was referred to physical therapy or a pain clinic for treatment of chronic pain.[9]  Finally, there is no evidence that plaintiff's doctors attempted to identify other causes of plaintiff's diffuse pain.  The lack of this kind of treatment is objective evidence that plaintiff's pain was not associated with fibromyalgia.

The court simply cannot say that, on this record, the ALJ erred by excluding fibromyalgia as a severe impairment.  In any event, there is certainly no evidence to support Dr. McCrory's opinion that diffuse pain limited plaintiff's ability to work.  None of the agency doctors opined that plaintiff was disabled due to pain.  In particular, in July 2005 an agency doctor noted "14/18" tender points and nonetheless concluded that plaintiff was not disabled.  And, in July 2006, plaintiff reported to Dr. McCrory "significantly decreased diffuse spinal pain with Cymbalta."

2.   Dr. Feliciano

The ALJ gave the following reasons for rejecting Dr. Feliciano's opinion:  (1) the finding of "chronic arthritis pain" is not supported by any objective evidence of record and is

---

[8]     The record does not reflect that either Dr. McCrory or Dr. Feliciano are such specialists.

[9]     While Dr. Kumar mentions that plaintiff "was given physical therapy" sometime in 2003, the CAR does not contain any physical therapy records.  Thus, to the extent physical therapy was prescribed, it appears that plaintiff did not attend.

1    inconsistent with radiological studies which rule out arthritis;[10] and (2) the findings of

2    "diminished muscle effort due to pain," "poor effort tolerance," and "pain and stiffness" are

3    inconsistent with other objective findings of normal motor power, normal gait, and ability to walk

4    on heels and toes.  As with Dr. McCrory, plaintiff contends that this analysis "completely ignored

5    the fact that [Drs. McCrory and Feliciano] attributed the majority of Ms. Gonzalez's assessed

6    limitations to the chronic pain and fatigue caused by her diagnosed fibromyalgia.  A review of Dr.

7    Feliciano's October 2006 assessment and notes confirms that his opinion is based largely on the

8    doctor's opinion that plaintiff is disabled due to chronic diffuse pain caused by fibromyalgia.  As

9    discussed above, however, the court cannot say that the evidence supports a finding that

10   fibromyalgia is a severe impairment or that, even if it is, chronic diffuse pain limits plaintiff's

11   ability to work.

12        **B.**     **Plaintiff's Credibility**

13             The Commissioner determines whether a disability applicant is credible, and the

14   court defers to the Commissioner's discretion if the Commissioner used the proper process and

15   provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

16   credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

17   F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

18   821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

19   and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

20   evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

21   credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

22   1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and

23   Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

24             If there is objective medical evidence of an underlying impairment, the

25   _____

26        [10]     Plaintiff does not contend otherwise.

21

1    Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

2    because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

3    341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

4            The claimant need not produce objective medical evidence of the
         [symptom] itself, or the severity thereof.  Nor must the claimant produce
5        objective medical evidence of the causal relationship between the medically
         determinable impairment and the symptom.  By requiring that the medical
6        impairment "could reasonably be expected to produce" pain or another
         symptom, the Cotton test requires only that the causal relationship be a
7        reasonable inference, not a medically proven phenomenon.

8        80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
         Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).
9

10   The Commissioner may, however, consider the nature of the symptoms alleged, including

11   aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at

12   345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's

13   reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2)

14   unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of

15   treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party

16   testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284

17   (citations omitted).  It is also appropriate to consider whether the claimant cooperated during

18   physical examinations or provided conflicting statements concerning drug and/or alcohol use.  See

19   Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to

20   symptoms greater than would normally be produced by a given impairment, the ALJ may

21   disbelieve that testimony provided specific findings are made.  See Carmickle, 533 F.3d at 1161

22   (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

23           As to plaintiff's credibility, the ALJ stated:

24           The Administrative Law judge finds that the claimant's allegations are not
         fully credible.  The claimant maintains that she does no household chores,
25       that her husband does them (Exhibit 12E/2).  She also reported that all she
         does is sleep – sleeping for two to three hours, getting up and then sleeping
26       again (Exhibit 12E/3).  However, she told the qualified medical examiner,

Dr. Nijjar, that she performed the normal household chores.  She complained that cooking for more than 30 minutes, washing dishes for more than 30 minutes, cleaning/scrubbing for more than 10 minutes, or driving for more than 45 minutes exacerbated her wrist and right elbow pain (Exhibit 7F/2).  Yet, the claimant reported that she can do household chores for only five minutes at a time.  Although she told Dr. Nijjar that she could drive for up to 45 minutes, she reported that she could drive for 15 minutes at the most before her hands start hurting (Exhibit 12E/2).  The claimant has no disuse atrophy or any other signs of the debility which would be present were she as inactive as she alleges.  The Administrative Law Judge finds that because the claimant's subjective allegations are not fully credible they cannot be relied upon to find her more limited than shown by the objective medical evidence of records.  The Administrative Law Judge notes that the consultative examiner discovered no objective findings in a thorough examination (Exhibit 10F/5).

Plaintiff argues that there is not necessarily any inconsistency in her statements because the ALJ was comparing statements made to Dr. Nijjar in 2003 with statements plaintiff made in a daily activities questionnaire in 2005 and that her condition worsened over time.  Given the worsening of her condition, plaintiff concludes that it was expected that she would report more severe limitations in 2005 than she did in 2003.  In particular, plaintiff notes that she was diagnosed with fibromyalgia after Dr. Nijjar's examination in 2003 and that this impairment accounts for the more severe limitations mentioned in 2005.  Plaintiff adds:  "Because the ALJ rejected the opinions of her treating physicians and discounted her diagnosis of fibromyalgia, he failed to appreciate that this impairment was an essential basis for her assessed limitations [in 2005]."

The ALJ compared plaintiff statements as revealed in Exhibit 7F (Dr. Nijjar's December 2003 report) and Exhibit 12E (a March 2005 daily activities questionnaire).  As framed by plaintiff, the question is whether fibromyalgia accounts for the more severe limitations outlined in plaintiff's 2005 statement.  Thus, if plaintiff did not develop fibromyalgia sometime between 2003 and 2005, then it would not be reasonable to expect that her statements in 2005 would be significantly different from those in 2003.  As discussed above in the context of the ALJ's evaluation of the medical opinions, the ALJ did not err in excluding fibromyalgia as a severe impairment.  In other words, fibromyalgia does not explain the more extreme limitations to which

1    plaintiff testified in 2005.  The ALJ was, therefore, entitled to discredit her testimony based on the

2    lack of correlation between her medically determinable impairments and the severity of

3    symptoms.

4            Plaintiff also argues that the ALJ's credibility finding is flawed because, contrary

5    to the ALJ's statement that "the consultative examiner discovered no objective findings in a

6    thorough examination," Dr. Kumar did in fact note objective findings.  Based on this, plaintiff

7    concludes that the ALJ's analysis is factually flawed.  While it is true that, technically speaking,

8    the ALJ erred in stating that Dr. Kumar did not note objective findings, it is clear that the ALJ

9    meant to say that Dr. Kumar found no objective findings to support plaintiff's testimony.

10           Finally, the court notes that the ALJ also rejected plaintiff's testimony because

11   "[t]he claimant has no disuse atrophy or any other signs of the debility which would be present

12   were she as inactive as she alleges."  Regardless of whether fibromyalgia which developed after

13   2003 explains the differences in her statements, or whether the ALJ erred with respect to Dr.

14   Kumar, the lack of atrophy or other objective medical indications that plaintiff was almost

15   completely inactive undermines her 2005 statements that pain was completely debilitating.

16       **C.**   **Hypothetical Questions**

17           Hypothetical questions posed to a vocational expert must set out all the substantial,

18   supported limitations and restrictions of the particular claimant.  See Magallanes v. Bowen, 881

19   F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's limitations, the

20   expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary

21   value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While the ALJ may pose to

22   the expert a range of hypothetical questions based on alternate interpretations of the evidence, the

23   hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by

24   substantial evidence in the record as a whole.  See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th

25   Cir. 1988).

26   ///

Plaintiff argues:

> As discussed above, the ALJ did not have a legitimate basis upon which to reject the opinions of the treating physicians or Ms. Gonzalez's testimony and statements. Consequently, the ALJ was legally required to include those limitations in his RFC. . . .

For the reasons already stated, the court does not agree.  In this case, the ALJ relied on the vocational expert's response to a hypothetical question setting forth the following limitations:

> . . . She can lift 20 pounds occasionally, 10 pounds frequently; stand and walk about six hours in an eight-hour day, sit about six hours in an eight-hour day; push and pull ability is unlimited other than by the capacity to lift and carry; posturally she can crawl occasionally, use ladders, ropes, and scaffolds occasionally.  Otherwise, she's limited to frequent climbing of stairs and ramps, frequent balancing, frequent stooping, frequent kneeling, and frequent crouching; manipulatively her limitations are she'd be limited to occasional gross manipulation bilaterally. . . .

This accurately describes plaintiff and the vocational expert testified that a person with this residual functional capacity could perform plaintiff's past relevant work.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

    1.    Plaintiff's motion for summary judgment (Doc. 19) is denied;

    2.    Defendant's cross-motion for summary judgment (Doc. 20) is granted; and

    3.    The Clerk of the Court is directed to enter judgment and close this file.

DATED:  December 9, 2008

_Craig M. Kellison_
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE